## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**PHILLIPS 66 PIPELINE LLC,**
*formerly known as* **ConocoPhillips**
**Pipe Line Company,**

**Plaintiff,**

**v.**

**ROGERS CARTAGE COMPANY,**

**Defendant.**                                   **Case No. 11-cv-497-DRH-DGW**

## MEMORANDUN & ORDER

**HERNDON, Chief Judge:**

### I.   INTRODUCTION

Three motions are currently pending before the Court: defendant Rogers Cartage Company's motion for summary judgment and brief in support (Doc. 74), plaintiff Phillips 66 Pipeline LLC's motion for partial summary judgment as to Rogers Cartage's CERCLA liability and memorandum in support (Docs. 77, 78), and finally Phillips' motion to strike the affidavit of Charles Johnson, Sr., whose averred statements Rogers Cartage offers in response to Phillips' requested relief (Doc. 87).

### II.   FACTUAL BACKGROUND

Phillips 66 Pipeline LLC ("Phillips") filed this action in June 2011, seeking recovery of costs from Rogers Cartage Company ("Rogers Cartage") Phillips incurred in performing response actions at a site in Cahokia, Illinois (the "Phillips Property"). In the 1960s, and possibly before, Rogers Cartage leased a five-acre

Page 1 of 33

parcel of land located at the southern edge of the Phillips Property, bounded on the south side by Cargill Road (or Cargill Elevator Road), formerly known as Red House Road (the "Cahokia Site") (Doc. 78-8, Petersen Aff., ¶ 7,; Doc. 78-9, Map of Red House Road, Ex. 1, p. 4; Doc. 78-9, Addendum to Aerial Analysis Report of Mary D. Sitton ("Sitton Report"), Ex. 3, p. 47). Eric Petersen ("Petersen") a program manager in the Remediation Management Group for Phillips (Doc. 78-8), states that he located a microfilm copy of the written 1960 lease between Rogers Cartage and Phillips' predecessor, Phillips Pipe Line Company ("1960 Lease Agreement"). Petersen avers that the 1960 Lease Agreement was accompanied by a cover page stating it superseded a previous agreement from 1950 (Doc. 78-8, Petersen Aff., ¶ 11).

A copy of the microfilm copy of the notarized 1960 Lease Agreement is attached to Petersen's affidavit (Doc. 78-8, Ex. 1, pp. 5-11). The cover page states that the ten-year lease (spanning from March 1960 to April 1970) covers a "five acre site for garage and office building" in Cahokia, Illinois (*Id.* at p. 5). It further states that Rogers Cartage, as lessee, shall erect and maintain at its own costs a garage building and office and that upon termination of the lease, shall remove said buildings and debris and restore the premises to the same condition as before the buildings were erected (*Id.* at p. 8, ¶ 2(b)). It is further noted that Rogers Cartage shall "not assign the lease nor sublet the premises or any portion thereof without the prior written consent of Phillips Pipe Line Company" (*Id.* at p. 8, ¶ 2(f)).

Of the five-acre Cahokia Site, Phillips has identified a roughly 2.7 acre area with elevated polychlorinated biphenyl compound ("PCB") levels in the soil (Doc. 78-10, Forrester Depo., Ex. 3, at pp. 4-5, and Fig. 2).

In the 1960s, Rogers Cartage was one of the "major truckers" hauling "products" for Monsanto Company ("Monsanto"), specifically PCBs or PCB waste (Doc. 78-9, Ex. 2, Malloy Depo., at 37-38; Doc. 78-6, Rogers Cartage's First Interrog. Resp. ¶ 4). Rogers Cartage admits that "trucks and trailers belonging to Rogers Cartage were washed out at the [Cahokia] Site" (Doc. 62, ¶ 22).

Phillips states sampling performed at the Cahokia Site in 2004, 2005, and 2008 showed PCBs and other hazardous substances present in the soil (Doc. 78-8, Petersen Aff., ¶ 10). Phillips paid for an "investigation and evaluation of the historic contamination at the [Cahokia Site] and hired consultants to prepare a draft work plan for removal of contaminated soil" (*Id.* at ¶ 13).

Phillips alleges that the U.S. Environmental Protection Agency ("EPA") first issued a General Notice of Potential Liability asking both Phillips and Rogers Cartage to remove elevated levels of PCBs from the Cahokia Site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") in 2009. Rogers Cartage does not address this allegation (*See* Doc. 69-2, August 28, 2012, letter from U.S. D.O.J. attorney stating she had reviewed Rogers Cartage's December 8, 2009, responses to the EPA's November 6, 2009, General Notice of Potential Liability and that "it appears your clients [Rogers Cartage] at that time denied liability and were unwilling to perform removal work at the [Cahokia] Site pursuant to EPA's proposed administrative order.").

Phillips' initial complaint asserted one claim for cost recovery against Rogers Cartage under Section 107 of CERCLA. 42 U.S.C. § 9607(a), and a citizen-suit claim under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B). After this Court denied Rogers Cartage's motion to dismiss Phillips' RCRA claim (Doc. 60), Phillips moved to file an amended complaint in November 2012. Phillips sought leave to amend its claims to bring a contribution claim under CERCLA Section 113(f). In explanation of its delay, Phillips stated that its contribution claim had only most recently become available to it, as the United States filed a complaint against it under CERCLA §§ 106 and 107 also in November 2012. *See* 42 U.S.C. 9613(f)(1) ("Any person may seek contribution . . . during or following any civil action under section 9606 of this title or under 9607(a) of this title."). This Court approved the proposed consent decree filed concurrently with the United States' CERCLA action in December 2012, requiring Phillips to perform an environmental cleanup of the property at issue ("Phillips Consent Decree"). *See United States of America v. Phillips 66 Pipeline LLC*, 12-cv-1159-DRH-PMF (Doc. 10).

Rogers Cartage opposed Phillips' request to amend its claims, alleging it had not made Rogers Cartage aware of Phillips' negotiations with the United States prior to November 2012 (Doc. 68). Phillips denied Rogers Cartage's allegations, asserting it misrepresented its knowledge of the settlement and the amount of discovery Phillips' proposed additional claim would require. In support, Phillips supplied the Court with the August 2012 letter from the United

States (cited above) offering Rogers Cartage a *final* opportunity to join the Phillips Consent Decree (Doc. 69-2).

A hearing was held before Magistrate Judge Wilkerson to flesh-out the parties' suggestions that "nefarious conduct was afoot" (Doc. 71). While the dispute over Phillips' proposed amendment was pending, the parties filed their instant motions for summary judgment (Docs. 74, 77). Ultimately, the Court granted Phillips' request for leave to file an amended complaint, finding that while Phillips had "been at most tardy in supplementing discovery, such tardiness has not prejudiced [Rogers Cartage]." And further, Rogers Cartage "exaggerated the amount of discovery that would be required in light of [Phillips'] new proposed claim and engaged in hyperbole with respect to the surprising nature" of Phillips' settlement with the United States (Doc. 84).

Thus, Phillips filed its first amended complaint on February 6, 2013 (Doc. 85). Phillips' amended complaint re-alleges its claim for cost recovery under CERCLA Section 107(a), 42 U.S.C. § 9607(a), and brings an additional claim for contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1). Phillips' RCRA claim is no longer before the Court.

This brings us to the pending motions. Phillips requests partial summary judgment as to Rogers Cartage's CERCLA liability. Phillips argues Rogers Cartage's status as a responsible party under CERCLA cannot be disputed in light of the admissible evidence available. By way of context, Rogers Cartage has been a party to prolonged CERCLA litigation before U.S. District Judge G. Patrick Murphy surrounding the alleged contamination of Sauget Area I ("SAI"). *See*

*United States v. Pharmacia, et al.,* 99-cv-63-GPM-PMF (S.D. Ill. 1999) ("*Pharmacia*"). While Phillips is not a party to *Pharmacia*, Rogers Cartage serves as a defendant/ crossclaim plaintiff/ third-party plaintiff in that litigation.

Phillips argues that at trial in 2003 in *Pharmacia* ("*Pharmacia* Trial"), the United States sought to prove Rogers Cartage was liable for response costs at SAI, based on alleged releases of hazardous substances from both the Cahokia Site and from a second Rogers Cartage facility in nearby Sauget, which Phillips asserts is not at issue in this litigation. According to Phillips, in the *Pharmacia* Trial, Rogers Cartage's liability hinged on whether hazardous substances that Rogers Cartage employees washed out of tankers at the Cahokia Site had migrated offsite and into Dead Creek. While Rogers Cartage was ultimately deemed not liable because, as Phillips characterizes the proceedings, the United States failed to prove that hazardous substances from Rogers Cartage's drainage ponds migrated offsite, Phillips argues the evidence in the *Pharmacia* Trial conclusively established Rogers Cartage's operation of the Cahokia Site and its employees' washing of hazardous substances into a low-lying portion of the property as part of their regular job duties (Doc. 77).

In response to Phillips' motion for partial summary judgment, Rogers Cartage offers what it construes as "direct eyewitness evidence" in contradiction of Phillips' assertion that Rogers Cartage is indisputably a former owner or operator of the Cahokia Site under CERCLA. Specifically, Rogers Cartage offers an affidavit of Charles Johnson, Sr. ("Charles"), and a deposition of Donald Mayer ("Mayer"), a former Monsanto employee. Rogers Cartage argues the statements of Charles

and Mayer sufficiently rebut Phillips' assertions because they state Ernie Cambridge ("Cambridge") and J.D. Tolbird ("Tolbird"), two men Rogers Cartage has identified in previous litigation as "employees" of Rogers Cartage (Doc. 78-23, pp. 10-11) (and who are now and were at the time of the *Pharmacia* Trial- according to Phillips- deceased) "owned or operated" the Cahokia Site. Phillips moves to strike Charles' affidavit, arguing it consists of conclusory statements that are not substantiated by specific facts and are not based on personal knowledge. Moreover, Phillips argues Rogers Cartage failed to properly disclose Charles as a potential witness (Doc. 87).

As to Rogers Cartage's motion for summary judgment, Rogers Cartage argues Phillips' cost recovery claim under CERCLA Section 107(a) must fail as a matter of law because Phillips has been sued by the United States and persons sued by the United States under CERCLA may not sue other responsible parties under CERCLA Section 107(a). Additionally, Rogers Cartage seeks summary judgment as to Phillips' now-abandoned RCRA claim, due to the EPA's supervising cleanup and also because Phillips judicially admitted that it would no longer pursue its RCRA claim (Doc. 74).

As the above motions are ripe for judicial resolution, the Court turns to the substance of these disputes.

### III.   LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery, and disclosures establish that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v.*

*Cook Cnty.,* 563 F.3d 598, 602–03 (7th Cir. 2009); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial burden of establishing the absence of fact issues and its entitlement to judgment as a matter of law. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). Once the movant has shown the facts entitle it to judgment in its favor, the burden shifts to the non-moving party to identify some evidence in the record that establishes a triable factual issue. *Trentadue v. Redmon,* 619 F.3d 648, 652 (7th Cir. 2010).

A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Indiana,* 259 F.3d 619, 625 (7th Cir. 2001). The Court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995). In conducting this inquiry, "a court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Smith v. City of Chicago,* 242 F.3d 737, 741 (7th Cir. 2001) (quotations and citations omitted); *see also Williams v. Vasquez,* 62 Fed. App'x. 686, 692 (7th Cir. 2003) ("[A]long with other courts, we have recognized that transcripts of testimony may be considered in support of, or opposition to, a motion for summary judgment.") (citing *Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976) ("[T]he record before us contains voluminous material cognizable on a motion for summary judgment, including numerous depositions and some

transcripts from the criminal trial at which defendants were previously acquitted of violating the civil rights of the Askews and other citizens.")).

## IV.   ARGUMENTS AND APPLICATION

### a. Phillips' Motion for Partial Summary Judgment

Phillips seeks partial summary judgment as to Rogers Cartage's liability under CERCLA. A party seeking cost recovery under CERCLA Section 107 or contribution under CERCLA Section 113 must prove the following: "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a 'responsible person' for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs." *Emergency Servs. Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012) (cost recovery claim) (quoting *Envtl. Transp. Sys., Inc., v. ENSCO, Inc.,* 969 F.2d 503, 506 (7th Cir. 1992) (applying same standard to contribution claim)).

As to prong 1, CERCLA defines a "facility" as including "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B).  Rogers Cartage does not dispute that the Cahokia Site is a "facility" as defined under CERCLA. As to prongs 3 and 4, Rogers Cartage admits that there has been a release of hazardous substances (specifically, PCB) at the Cahokia Site (Doc. 62, ¶¶ 20, 21), and that Phillips has incurred costs in response to a release of hazardous substances at the Cahokia Site (Doc. 62, ¶ 30).

## I.  Rogers Cartage's Status as a PRP

The crux of this dispute lies in Roger Cartage's status as a "covered person" under CERCLA. *See* 42 U.S.C. § 9607(a)(1)-(4). CERCLA imposes liability upon four classes of "persons," or so-called potentially responsible parties ("PRP"), including: (1) present owners and operators of facilities; (2) past owners or operators of the facility at the time of disposal of a hazardous substance; (3) arrangers of the disposal of hazardous substances at the facility; and (4) certain transporters of hazardous substances. *See id.*

Phillips argues Rogers Cartage is a former "owner or operator" of the Cahokia Site. Under 42 U.S.C. § 9607(a)(2), Phillips must prove Rogers Cartage owned or operated the Cahokia Site at the time of disposal of the hazardous substances. 42 U.S.C. § 9607(a)(2). In characteristically unhelpful fashion, CERCRLA defines the "owner or operator" of a facility as "any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii); *see United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (The phrase "owner or operator" is defined only by tautology, however, as "any person owning or operating" a facility, § 9601(20)(A)(ii), and it is this bit of circularity that prompts our review.").

### 1.  Former Owner, 42 U.S.C. § 9607(a)(2)

First, while the parties do not directly address the distinction, as this Court understands CERCLA, "owner or operator" liability denotes two separate concepts. *See id.* at 64 ("If the Act rested liability entirely on ownership of a polluting facility, this opinion might end here; but CERCLA liability may turn on operation as well as ownership . . ."); *Sidney S. Arts Co. v. Pipefitters Welfare*

*Educ. Fund,* 25 F.3d 417, 420 (7th Cir. 1994); (citing *United States v. Kayser-Roth Corp. Inc.*, 910 F.2d 24, 26 (1st Cir. 1990) ("Congress, by including a liability category in addition to owner ('operators') connected by the conjunction 'or,' implied that a person who is an operator of a facility is not protected from liability by the legal structure of ownership.")).

In this case, Rogers Cartage is a former lessee of the Cahokia Site. It does not appear that the Seventh Circuit has directly addressed whether a former lessee of a facility can be held liable as a former owner under CERCLA. The Second Circuit in *Commander Oil Corp. v. Barlo Equipment Corp.*, 215 F.3d 321, 328-29 (2d Cir. 2000), endorsed a five-factor balancing test in determining "de facto" ownership for purposes of "owner" liability of lessees under CERCLA, including:

> (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs.

*Id.* at 330–31.

However, the Court feels the Seventh Circuit's decision in *United States v. Capital Tax Corp.*, 545 F.3d 525, 532 (7th Cir. 2008), in which the court looked to the Illinois common-law doctrine of equitable conversion in interpreting "ownership" under CERCLA, suggests that this Court should also look to the relevant state common law in determining whether Rogers Cartage as a former

lessee of the Cahokia Site should be found liable as a former "owner" under CERCLA.

Illinois law recognizes that "[o]wnership of real estate is a broad concept and can apply to one other than the record titleholder." *Bd. of Educ. of Glen Ellyn Cmty. Consol. Sch. Dist. No. 89*, 825 N.E.2d 746, 754 (Ill. App. 2005) (finding school district did not have sufficient incidents of ownership in leased property to qualify for a tax exemption) (citing *Wheaton Coll. V. Dep't of Revenue*, 508 N.E.2d 1136, 1137 (Ill. App. 1987)). The meaning of "owner" turns on the "nature and purpose of the statute involved." *Id.*  In determining ownership for tax purposes (as this is the context in which this issue is commonly raised), Illinois courts are concerned with the "realities of real property rather than legal title." *Id.* (citing *Chicago Patrolmen's Ass'n v. Department of Revenue*, 664 N.E.2d 52 (1996)). Thus, the true determiners of "ownership" are "control and the right to enjoy the benefits of the property. The primary incidents of ownership include the right to possession, the use and enjoyment of the property, the right to change or improve the property, and the right to alienate the property at will." *Id.* (citations omitted).

The Illinois common law factors cited above (which are of course quite similar to those listed in *Barlo*) are applicable in this instance. Phillips generally argues that pursuant to the 1960 Lease Agreement, Rogers Cartage maintained exclusive control over the Cahokia Site and was required to return it to its original condition at the end of the lease and thus it is a former "owner" of the Cahokia Site.

It is true that the 1960 Lease Agreement required that Rogers Cartage erect and maintain the garage and office buildings and remove these buildings at the end of the lease term at its own expense, as well as restore the premises to their initial condition. It required Rogers Cartage to pay all taxes and assessments on the buildings, while Phillips paid the ad valorem taxes on the land exclusive of Rogers Cartage's improvements. Rogers Cartage was not allowed to assign or sublet the premises without Phillips' prior consent, was required to permit Phillips to enter upon the leased premises to view the conditions at all reasonable times, and was required to "yield up the leased premises" at the expiration or termination of the lease (Doc. 78-8).

While for the reasons below the Court finds Rogers Cartage is clearly liable as a direct former "operator" of the Cahokia Site, it feels resting Rogers Cartage's liability on its former "ownership" of the Cahokia Site "would conflate two statutorily distinct categories of potentially responsible parties." *Barlo,* 215 F.3d at 328. Under the terms of the lease, Rogers Cartage was not free to assign, encumber or otherwise alienate its interest in the Cahokia Site without Phillips' written consent, its right to make alterations to the Cahokia Site was restricted, it did not pay the ad valorem taxes on the land, was required to return the land to its initial condition upon the lease term's termination, and was required to allow Phillips to enter the premises at will.  As the Ninth Circuit recently commented,

> [I]f Congress intended to impose no-fault, no-cause liability on the holder of a mere possessory interest in real property, the least it could do is speak clearly. In establishing "owner" liability, Congress did not say "de facto owner," or "possessor," or "person with some incidents or attributes of ownership," as it has in other legislation.

> *See, e.g.,* 26 U.S.C. § 2042(2) (stating that a life insurance policy can be included in the decedent's gross estate for estate tax purposes as if owned by the decedent, if the decedent possessed "incidents of ownership" in the insurance policy). Instead it used the unmodified term "owner."

*City of Los Angeles v. San Pedro Boat Works,* 635 F.3d 440, 451 (9th Cir. 2011) (finding holder of revocable permit not a former "owner" under 42 U.S.C. 9607(a)(2)). Thus, for the reasons stated below, the Court finds summary judgment is appropriate as to Rogers Cartage's liability as a former "operator" of the Cahokia Site. However, it declines to premise Rogers Cartage's liability on a theory that it is a former "owner" of the Cahokia Site under CERCLA.

### 2. Former Operator, 42 U.S.C. § 9607(a)(2)

#### a. Phillips' Evidence of Roger Cartage's Status as a Former "Operator"

As to the definition of "operator," the Supreme Court has stated,

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods,* 524 U.S. at 66.

Thomas Budnik ("Budnik"), a corporate representative of Rogers Cartage, confirmed at his deposition that Rogers Cartage was lessee to the 1960 Lease Agreement covering to his knowledge the only "facility" Rogers Cartage leased in Cahokia during that time (Doc. 78-11, Budnik Depo., at 74:17-75:6, 82:14-83:18).

As further evidence that Rogers Cartage, through its employees, agents, and managers, conducted and managed operations relating to pollution, including operations having to do with the disposal and leakage of hazardous substances, Phillips cites the following:

- Aerial photos from the 1950s and 1960s confirming the presence of trucks, buildings, and impoundments at the Cahokia Site (Doc. 78-9, Ex. 3, pp. 45-53, Addendum to Sitton Report; Doc. 78-1, Trial Tr. Vol. 1, at 184-186 (discussing aerial photos of Cahokia Site); Doc. 78-15, Ex. 267 from 2003 *Pharmacia* Trial).

- Documents originally obtained by Rogers Cartage from the St. Clair County assessor's office, depicting the layout of buildings at the Cahokia Site, filed under Rogers Cartage's name (Doc. 78-16, Ex. 220 from *Pharmacia* Trial; Doc. 78-2, Trial Tr. Vol. 2, at 301:7-9 (statement by the District Judge Murphy that "we have on file in the assessor's office a plat of this very location filed under the name Rogers Cartage."); Doc. 78-1, Trial Tr. Vol. 1, at 182-183 (discussing documents)).

- *Pharmacia* Trial testimony from Charles (at one point seven Johnson brothers worked for Rogers Cartage) (Doc. 78-3, Trial Tr. Vol. 3, at 629:11) that he began working at the Cahokia Site for Rogers Cartage in 1963, that it was a "Rogers Cartage terminal," that the side of tankers had "Rogers Cartage" lettered on them, that Tolbird was "our dispatcher" who made a cleaning list each day that instructed Charles and the other tank cleaners about which tankers to wash, and that wastewater from truck washing drained into a pond (Doc. 78-3, Trial Tr. Vol. 3, at 624:23-626:1, 628:1-7, 630:10-15, 632:25-636:25).

- *Pharmacia* Trial testimony from Donel Johnson ("Donel"), former tank cleaner, that he "started with that company [Rogers Cartage]… down in the old place in Cahokia," that he began by working weekends washing exteriors of trucks there, and that employees "would wash on the ground outside" (Doc. 78-3, Trial Tr. Vol. 3, at 644:1-13, 645:11-12).

- Testimony from Gilbert Johnson ("Gilbert"), former tank cleaner, that he started working for Rogers Cartage in 1955, that he worked for the company continuously for 44 years before retiring, and that his "bosses" included "J.D." and Cambridge (Doc. 78-17, Gilbert Depo., at 6-7, 13; Doc. 78-18, Trial Tr. Vol. 4 in *Donel Johnson v. Rogers Cartage Co.*, No. 98-L-310 (St. Clair County, Ill., July 23, 2001), at 828:12-19).

- Testimony from John Johnson ("John"), former tank cleaner, that he was hired by Cambridge to work as a tank cleaner for Rogers Cartage in 1957, that employees "had to follow orders," and that Tolbird was "the boss" (Doc. 78-19, John Depo., at 10-12, 13:13-14, 18:15).

- Testimony from former Rogers Cartage terminal manager Ruth Levin ("Levin") that she began working at Rogers Cartage's nearby Sauget terminal a month after it opened in April 1970, and that prior to that time, "They had another facility... I know it was in Cahokia, but I don't know exactly where it was at" (Doc. 78-20, Levin Depo., at 153:6-16).

- Testimony from Mayer that he worked for Monsanto from 1947 to 1985 (Doc. 78-3, Trial Tr. Vol. 3, at 596:5-7); that he drove past the former Rogers Cartage Cahokia terminal once or twice per week prior to 1970 (*Id.* at 606:1-8); that he could tell that Rogers Cartage was "very busy" with "washing" and preparing for loads (*Id.* at 606:10-18); and that "they had a lagoon behind their facility which is where they quenched their liquids" (*Id.* at 606:23-25).

- An appendix to a published decision from the Interstate Commerce Commission, dated September 9, 1964, stating that, as of 1963, the three motor carriers serving Monsanto's Krummrich plant in Sauget, Illinois were Slay Transportation Co., Rogers Cartage, and a contract carrier, and that "[e]ach of these has local facilities including those for cleaning equipment" (Doc. 78-21, *In re Slay Transp. Co.*, 96 M.C.C. 47, 54 (Sept. 9, 1964)).

- An expert report prepared for Rogers Cartage by Gary R. Dyhouse ("Dyhouse") in April 2003 that included a map depicting the "Old Rogers Cartage Site" on the Phillips Property. The report stated that Rogers Cartage occupied the Cahokia Site from approximately 1958 to 1970 (Doc. 78-9, Ex. 4, Dyhouse Report, at pp. 59-60).

Phillips also offers evidence that Rogers Cartage owned or operated the Cahokia Site "at the time of disposal of any hazardous substance." 42 U.S.C. § 9607(a)(2). "Disposal" is defined as the,

> [D]ischarge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3); 42 U.S.C. § 9601(29). The term "hazardous substance," as defined in 42 U.S.C. § 9601(14), includes a number of listed substances, including PCBs. 42. U.S.C. § 9602; 40 C.F.R. § 302.4, Table 302.4.

Phillips cites Charles' testimony that about 15 trailers per day were washed at the Cahokia Site (Doc. 78-3, at 630:16-25), the "wash water" that flowed into a "pond" was "dirty with the product" (*Id.* at 636:15-19), and that the "pond" caught fire at one point (*Id.* at 627: 17-20). Donel also stated that employees washed the trailers "on the ground outside," "the pond where they cleaned the trailers most everything went out there when they washed trailers," and that the pond had "a lot of different chemicals in" it (*Id.* at 645:10-20).

Further, Phillips cites Mayer's testimony that Rogers Cartage transported products for Monsanto in the 1960s, including: PCBs, phosphorus oxychloride, phosphorus trichloride, monochlorobenzene (a/k/a "chlorobenzene"), hydrochloric acid, and phosphoric acid (*Id.* at 600:14-602:5). These chemicals are listed as hazardous substances under CERCLA. 40 C.F.R. § 302.4, Table 302.4. Mayer also testified that at the time Rogers Cartage "hauled" for Monsanto, Monsanto did not require haulers to use "dedicated" tank trailers that were limited to carrying one substance; thus, Rogers Cartage's trailers would have regularly been washed between loads (*Id.* at 604:6-605:2; Doc. 78-24. Mayer Depo. Nov. 12, 2012, at 64:8-11, and Mayer Depo. 1995, at 73:9-23).

Finally, Phillips offers expert opinions concerning the disposal of hazardous substances during Rogers Cartage's lease operation of the Cahokia Site. Phillips' expert, Forrester, a chemical engineer with over 30 years' experience, concluded

that Rogers Cartage's truck washing operations at the Cahokia Site from the 1950s to 1970 resulted in the release of PCBs and other hazardous chemicals into soils and sediments at the Cahokia Site (Doc. 78-10, Forrester Depo., Ex. 3, at 6-8). He further found:

- Petroleum-impacted soil and groundwater at the Phillips Terminal are located north of, and. do not extend on to, the former Cahokia Terminal. Site investigations have delineated a "clean zone" between the Cahokia Terminal and the Phillips Terminal impacts.

- Indicator parameters benzene and arsenic were not detected in soil, sediment, groundwater, and groundwater well point data in the vicinity of the Cahokia Terminal in PPL's Perimeter Sampling Program.

- Detections of PCBs are limited to the former Cahokia terminal, with the highest concentrations in the sediments of the former surface impoundments, which is consistent with Rogers Cartage's terminal and truck washing operations.

- Based on review of this information, I conclude that Phillips Terminal operations have not contributed to the PCB-impacted sediment at the Cahokia Terminal. I have not seen evidence of any source of PCBs and other hazardous substances other than Rogers Cartage's operations at the Cahokia Terminal.

(*Id.* at 9).

### b. Rogers Cartage's Evidence of a Factual Dispute Concerning its Status as a Former Owner or Operator

#### i. Phillips' Motion to Strike Charles' January 17, 2013 Affidavit (Doc. 87)

The Court must first address Phillips' motion to strike Charles' affidavit before it can discern whether Rogers Cartage has sufficiently identified some evidence in the record that establishes a triable factual issue as to its status as a

former operator. Rogers Cartage offers Charles' January 17, 2013 affidavit (Doc. 82-1), as evidence that Rogers Cartage was not an "owner or operator" of the Cahokia Site. Charles states that he worked at the terminal and truck wash located on the Cahokia Site from 1963 to 1970 (*Id.* at ¶ 2). Charles states that four of his brothers began working at the Cahokia Site "before [he] did" (*Id.* at ¶ 3). Specifically, his brother Gilbert began working at the Cahokia Site "during the mid 1950s" (*Id.* at ¶ 4).

 In Rogers Cartage's opinion, it most pertinently offers Johnson's following additional statements:

> 5. The truck terminal and truck wash business located on Phillips 66's property was from the 1950s first owned and operated by Ernie Cambridge. Ernie Cambridge was the owner and boss.
>
> 6. During the mid 1960s, Ernie Cambridge sold the truck terminal and truck wash business located on Phillips 66's property to J.D. Tolbird and Joe Riley. From the mid 1960s until the truck wash and terminal closed around 1970, J.D. Toldbird and Joe Riley owned, operated, and ran the truck terminal and truck wash business.

(*Id.*).

Phillips moves to strike Charles' affidavit. Phillips argues Charles' affidavit consists almost entirely of legal conclusions regarding who legally owned and operated the truck wash terminal on the Cahokia Site which are not based on personal knowledge and not substantiated by any specific facts.

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 56(c)(4), an affidavit "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant [] is competent to testify on the matters stated." *See* Fed. R. Civ. P. 56(c)(4). A Court cannot

consider averred statements which do not comply with the above rule. *See Adusumilli v. City of Chicago,* 164 F.3d 353, 359 (7th Cir. 1998) (interpreting Fed. R. Civ. P. 56(e), predecessor to 56(c)(4)).

As to paragraph 5, Charles states that the truck wash on the Cahokia Site was first owned in the 1950s by Cambridge; the "owner and boss." However, Charles also states that he did not start working at the truck wash until 1963.[1] Thus, Charles infers that he derives his knowledge concerning who "owned and operated" the truck wash in the 1950s from his brothers. The statement contained in paragraph 5 is obviously based on unsubstantiated speculation and is thus stricken. *See Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir. 2003) ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'") (quoting *Visser v. Packer Eng'g Assoc.,* 924 F.2d 655, 659 (7th Cir. 1991)).

As to paragraph 6, Charles does not provide any information concerning the basis of his statements as to who "owned, operated, and ran the truck terminal," from the mid-1960s to 1970. In opposition to the motion to strike, Rogers Cartage argues that Charles similarly testified in the *Pharmacia* Trial that Cambridge "owned and operated" the terminal located on the Cahokia Site. At the *Pharmacia* Trial, when first asked who "owned" the terminal at the Cahokia Site, Charles answered, "Ernie Cambridge" (Doc. 78-3, Trial Tr. Vol. 3, at 629:13-15).

---

[1] Notably, Charles' affidavit does not mention Rogers Cartage, despite Charles' extensive testimony in the *Pharmacia* Trial in which he admits that he was employed by Rogers Cartage.

Later, when again asked, "[a]nd somebody named Cambridge owned the facility. Who is Cambridge?" Charles answered, "Cambridge. Ernie Cambridge was terminal manager" (*Id.* at 638:11-13). Thus, the Court would not characterize Charles' previous testimony in the same manner as Rogers Cartage. Moreover, in the *Pharmacia* Trial, Charles was asked whether truck washing constituted the "limit" of his "responsibility." Charles answered, "[y]eah, I was just, what's it called, a tank cleaner. Cleaned the tanks inside. On occasion I would wash one outside if we didn't have a lot to do" (*Id.* at 625:15-20).

Without providing a foundation for his statements in paragraph 6, such as allegations concerning the viewing of legal documentation which he can describe in detail constituting the legal transactions regarding purchase and sale of the Cahokia Site terminal, Charles cannot testify as to who bought or sold the terminal while he was employed there as a truck washer. He can testify as to who hired him, what company name was on his checks, who gave him direction concerning his position or duties. However, Charles' conclusory statement that, "Ernie Cambridge sold the truck terminal and truck wash business . . . to J.D. Tolbird and Joe Riley" and that "[f]rom the mid 1960s until the truck wash and terminal closed around 1970, J.D. Toldbird and Joe Riley owned, operated, and ran" the terminal are not admissible without more detailed factual allegations based on Charles' personal knowledge and experience as a truck washer. Thus, based on Charles' previous testimony concerning the limits of his responsibilities while admittedly employed by Rogers Cartage, and his affidavit's lack of foundation, paragraph 6 is also stricken from this Court's consideration. *See*

*Lujan v. Nat'l Wildfire Fed'n,* 497 U.S. 871, 888 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of a complaint with conclusory allegations of an affidavit.").

Thus, the Court grants in part and denies in part Phillips' motion to strike Charles' affidavit, as the statements contained in paragraphs 5 and 6 are stricken (Doc. 87).[2]

### ii. Mayer's Deposition

Rogers Cartage also offers Mayer's deposition from November 2012. Mayer, former Monsanto employee, answered affirmatively that Ernie Cambridge "operated" a terminal in Cahokia, Illinois at some point in the late 1950s.  At some point, (probably the mid-sixties, but he admitted to speculation) Mayer stated that Cambridge sold "that business" to Tolbird. However, Mayer again noted confusion concerning the relation between the Cahokia Site terminal and the separate facility in Sauget, Illinois, which Mayer stated Tolbird "built" (Doc. 82-2, Mayer Depo., at 22-29).

On cross examination, Mayer was shown a copy of the 1960 Lease Agreement. After Mayer stated he understood that the Cahokia Site was located on leased Phillips property in the 1960s, he acknowledged he was not aware of any lease agreement between Cambridge and Phillips (or its predecessor companies),

---

[2] The Court notes that Phillips raises an alternative reason for striking Charles' affidavit. Phillips attempts to argue that Rogers Cartage did not properly disclose Charles as a potential witness. As the Court strikes the most pertinent portions of Charles' affidavit because he does not lay a foundation for his blanket assertions, the Court will not meaningfully address Phillips' arguments concerning its lack of notice. However, the Court will note that Rogers Cartage did disclose Charles Johnson as a witness, although it wrongly identified him as a *jr.* instead of a *sr.* Given Phillips' reliance on Charles' previous *Pharmacia* Trial testimony, the Court finds Phillips' arguments concerning lack of notice are unfounded.

he only thought that Cambridge had leased the property because Tolbird had made a comment to that effect at one time, and that the name of the business which Cambridge and later Tolbird "operated" was "Rogers Cartage" (Doc. 78-24, Mayer Depo., at 71-73).  Moreover, Mayer stated he did not know of anything that either Cambridge or Tolbird "owned" at the Cahokia Site terminal and he had never seen nor been involved in any agreements between Rogers Cartage and Cambridge or Tolbird (*Id.* at 73-74).

Further, when asked what he meant when he said Cambridge "operated" the Cahokia Site terminal, Mayer answered, "He was there" (*Id.* at 75). As Mayer had earlier referred to Cambridge as a "manager," Mayer was asked, "[w]ho was he a manager for?" Mayer, explained, "[h]is facility. That's a general term I use and I assume since he's the one there and just figuring he's the manager. That didn't imply on my part that he's the owner, but I did know subsequently, though [based solely on his conversation with Tolbird], that he leased the property from Phillips (*Id.* at 75-76). Mayer then went on to reiterate that Rogers Cartage hauled products for Monsanto from the Krummrich Plant, he had seen Rogers Cartage trucks at the Krummrich Plant in the 1950s and 60s with their "big red decal on the trucks" (*Id.* at 76-77).

### c.  Rogers Cartage is Liable Under CERCLA as a Former Operator

On the basis of the above, Phillips has sufficiently shown facts which demonstrate Rogers Cartage's liability as a former "operator" of the Cahokia Site. In sum, Phillips has presented the 1960 Lease Agreement between Phillips and

Rogers Cartage, a plat of the Cahokia Site filed under Rogers Cartage's name, testimony from Rogers Cartage's former employees stating that they washed out chemicals from Rogers Cartage's trucks daily at the Cahokia Site and that the wastewater would drain into a pond, and Dyhouse's expert report, prepared for Rogers Cartage, stating Rogers Cartage "occupied" the Cahokia Site from about 1958-1970. Additionally, Phillips offers Mayer's testimony that Rogers Cartage transported hazardous substances for Monsanto in the 1960s and Forrester's expert opinion that Rogers Cartage's operations at the Cahokia Site terminal from the 1950s to 1970 resulted in the release of PCBs and other hazardous chemicals into soils and sediments at the Cahokia Site.

At the conclusion of Charles' testimony in the *Pharmacia* Trial, District Judge Murphy asked Rogers Cartage's counsel, "do you still conte[s]t that [the Cahokia Site] was not a facility that was operated by Rogers Cartage. Not that their trucks were washed there. Facility operated by Rogers Cartage. We've got a man that just came [and] said he was employed by Rogers Cartage and washed trucks and had for years." Rogers Cartage's counsel stated, "I guess, Judge, it was either a Rogers Cartage facility or a third party under contract to Rogers Cartage. Those are the two ways it could go" (Doc. 78-3, Trial Tr. Vol. 3, at p. 642:2-11). The record before this Court establishes that Rogers Cartage, through its employees and agents, directly "operated" the Cahokia Site. Rogers Cartage has not come forward with evidence that would reasonably permit the finder of fact to find in its favor as to this material, disputed issue. *McGrath,* 44 F.3d at 569.

Charles' "pertinent" statements are inadmissible. Mayer's testimony merely

bolsters Phillips' assertions that Cambridge and Tolbird (now deceased) were Rogers Cartage's employees and/or agents. Mayer, an individual who seemingly never worked for Rogers Cartage, stated Cambridge and later Tolbird "operated" a business called "Rogers Cartage." As to Mayer's answering "yes" when asked whether Cambridge "sold" "his business" to Tolbird, similarly to Charles, Mayer is not competent to testify in this manner, as his cross-examination demonstrates. His allegations concerning Cambridge's "lease" of the property are similarly based on inadmissible speculation.

Based on the record before this Court, Phillips has sufficiently demonstrated that Rogers Cartage was "simply someone who direct[ed] the workings of, manage[d], or conduct[ed] . . .  operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations" at the Cahokia Site. *Bestfoods,* 524 U.S. at 66. As Rogers Cartage has not presented evidence demonstrating a triable factual dispute concerning its status as a former operator, Phillips' motion for partial summary judgment as to Rogers Cartage's CERCLA liability is **GRANTED** (Doc. 77).

### 3. Transporter and/or Arranger, 42 U.S.C. § 9607(a)(3)-(4)

Alternatively, Phillips argues Rogers Cartage is liable as one who either arranged for disposal or treatment of a hazardous substance, 42 U.S.C. § 9607(a)(3), or transported those substances for disposal at a site it selected, 42 U.S.C. § 9607(a)(4). In addition to the above, Phillips also cites Rogers Cartage's admission that "trucks and trailers belonging to Rogers Cartage were washed out

at the [Cahokia] Site" (Doc. 62, ¶ 22). Thus, Phillips argues Rogers Cartage is liable for either arranging, "by contract, agreement, or otherwise," for the residues of its trucks to be washed out at a facility "operated by another party or entity," § 9607(a)(3), or for selecting the Cahokia Site for disposal of its tanker residue and directing its drivers to transport Rogers Cartage's tankers there to be washed, § 9607(a)(4) (*See also* Doc. 78-3, Trial Tr. Vol. 3, at 630:7-15 (Charles' testimony that when he arrived to work, Tolbird, Rogers Cartage's "dispatcher," would make out a cleaning list of what trailers needed to be washed that day)). In opposition, Rogers Cartage argues Phillips has "waived" its ability to seek summary judgment under 42 U.S.C. § 9607(a)(3)-(4), basically because Phillips has not specifically cited these subsections in its amended complaint.

As to whether Phillips has "waived" its theory that Rogers Cartage is liable as an arranger or transporter under § 9607(a)(3)-(4), the initial and amended complaint clearly state, "Rogers Cartage hauled hazardous substances, including [PCB] waste, to disposal facilities and washed out trucks at the [Cahokia] Site" (Docs. 2, ¶ 9; 85, ¶ 9), and that "PCB waste and other hazardous substances spilled or leaked from the trucks, impoundments and drainage features onto the soil at the [Cahokia] Site" (Doc. 2, ¶ 10; Doc. 85, ¶ 10). Phillips' Count I cites CERCLA cost recovery under 42 U.S.C. § 9607(a) and alleges Rogers Cartage is a "covered person" under § 9607(a).

Although not strictly necessary to this Court's ruling as the Court finds summary judgment is appropriate based on Rogers Cartage's status as former operator under 42 U.S.C. § 9607(a)(2), the Court alternatively finds Phillips has

not waived recovery pursuant to Rogers Cartage's liability under § 9607(a)(3)-(4).

Notice pleading does not require plaintiffs to plead specific theories of recovery, *Doe v. Smith,* 429 F.3d 706, 708 (7th Cir. 2005), and Phillips' initial and amended allegations sufficiently notified Rogers Cartage that it may be liable as a "covered person" pursuant to § 9607(a)(2), as well as (3)-(4). At this stage in the proceedings, on the basis of Phillips' admissible supportive evidence recited above, Phillips has sufficiently demonstrated the existence of facts which are consistent with its alternate theory that Rogers Cartage is liable as an arranger or transporter under § 9607(a)(3)-(4). *See id* (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41 (1957)). Thus, in similar alternative fashion, the Court finds Phillips is entitled to summary judgment on its theory that Rogers Cartage is liable as an arranger and/or transporter under § 9607(a)(3)-(4).[3]

### b. Rogers Cartage's Motion for Summary Judgment

### I. Summary Judgment on RCRA Claim Denied

Rogers Cartage seeks summary judgment as to Phillips' now-abandoned RCRA claim, in part because Phillips "admitted that it will no longer pursue" its

---

[3] As for Rogers Cartage's affirmative defenses to liability under CERCLA, Rogers Cartage summarily states that "because the uncontroverted evidence is that third parties Ernie Cambridge's business and later J.D. Tolbird's business owned, controlled, and operated the business which Phillips contends polluted its property, Rogers Cartage is also protected from liability by the 'third party' defense." Under § 9607(b)(3), a defendant must demonstrate by a preponderance of the evidence that (1) the actual or threatened release and damages were caused solely by a third party, (2) the third party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant, and (3) the defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable acts or omissions of the responsible third party. Although Rogers Cartage has not sufficiently raised the "third party defense" to warrant review, as the record clearly shows Rogers Cartage directly formerly operated the Cahokia Site, the Court will not entertain Rogers Cartage's "third-party defense" theory any further.

RCRA claim. Phillips' decision not to pursue its RCRA claim when the Court granted Phillips' request to amend its complaint has rendered Roger Cartage's request for summary judgment as to that claim moot. *See Powell v. McCormack,* 395 U.S. 486, 496-97 (1969). On this basis, Roger Cartage's motion for summary judgment as to Phillips' RCRA claim is denied.

## II. Summary Judgment on § 107 Claim Denied and Deferred Until Damages Phase

Rogers Cartage also seeks summary judgment as to Phillips' Count I, CERCLA cost recovery under Section 107, 42 U.S.C. § 9607(a). Rogers Cartage argues persons sued by the United States may not sue other PRPs for cost recovery under CERCLA. Thus, Rogers Cartage argues a Section 107 claim is only available to those who perform a clean-up without a CERCLA lawsuit or CERCLA enforcement action brought against them. In opposition, Phillips argues that its Section 107 claim is for recovery of costs *voluntarily* incurred *prior* to its settlement with the United States, not covered by the Phillips Consent Decree, and thus only recoverable through a Section 107 claim.

Under Section 107, one PRP has the same rights as an innocent party to sue another PRP for cleanup costs incurred in a removal or remedial action. *See United States v. Atl. Research Corp.,* 551 U.S. 128, 135-36 (2007) (interpreting 42 U.S.C. § 9607(a)(4)(B)). However, the crux of Rogers Cartage's argument rests on the distinct remedies available to a PRP under Section 113 for contribution. *See* 42 U.S.C. § 9613; *Atlantic Research,* 551 U.S. at 139 n. 6 ("[C]osts incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of

reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).").

As the basis of its Section 107 claim, Phillips states sampling performed at the Cahokia Site in 2004, 2005, and 2008 showed PCBs and other hazardous substances present in the soil (Doc. 78-8, Petersen Aff., ¶ 10). Before it entered into the Phillips Consent Decree, just recently approved by this Court in December, 2012, Phillips paid for an "investigation and evaluation of the historic contamination at the [Cahokia Site] and hired consultants to prepare a draft work plan for removal of contaminated soil" (*Id.* at ¶ 13). The response costs allegedly incurred voluntarily prior to Phillips' settlement with the United States exceed $125,000.00 (Doc. 83-1, Supp. Petersen Aff. ¶¶ 3, 4).

Phillips states the Phillips Consent Decree requires it to design and implement a work plan for the excavation, removal, and disposal of approximately 16,000 tons of contaminated soil (Doc. 74-2, Phillips Consent Decree, § VI at ¶¶ 10(a),(e), & App. C at II), but does not address Phillips' prior investigation and delineation work and does not direct Phillips to conduct further investigation into the contamination.

Thus, the question presented here is can Phillips bring both a Section 113(f)(1) claim against Rogers Cartage for an equitable share of the costs it will incur in connection with the Phillips Consent Decree, in addition to a Section 107 claim for response costs it allegedly voluntarily incurred prior to its settlement with the United States and outside of the settlement's scope?

As alluded to above,

> [E]ach CERCLA right of action carries with it its own statutory trigger, and each is a distinct remedy available to persons in different procedural circumstances. Where a person has been subjected to a civil action under 42 U.S.C. §§ 9606 or 9607(a), he may attempt to recover his expenditures through a contribution suit under 42 U.S.C. § 9613(f)(1). Where a person has resolved his liability to the United States, or to a state, for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement, he may attempt to recover his expenditures in a contribution suit pursuant to 42 U.S.C. § 9613(f)(3)(B). If neither of those triggers has occurred, a plaintiff does not have a claim for contribution under CERCLA. That does not mean he has no remedy, however. Any time a person has incurred "necessary costs of response ... consistent with the national contingency plan[,]" CERCLA provides for a § 9607(a)(4)(B) cost recovery action. These are the plain terms of the statute.

*Bernstein v. Bankert,* --- F.3d ----, 2013 WL 3927712 (July 31, 2013) (amending and superseding *Bernstein v. Bankert,* 702 F.3d 964 (7th Cir. 2012) (citations omitted)). However, as the Seventh Circuit most recently reiterated in *Bernstein*, in *Atlantic Research,* the Supreme Court left open the possibility that there were ever any circumstances under which a plaintiff may bring both a cost recovery *and* a contribution claim under CERCLA. *See id.* at *9 (citing *Atlantic Research,* 551 U.S. at 139 n. 6) ("We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all. For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both.") (citations omitted)).

Rogers Cartage is undoubtedly aware of Judge Murphy's decision cited by Phillips in *Pharmacia,* 713 F. Supp. 2d 785 (S.D. Ill. 2010) (Murphy, J.), denying

Rogers Cartage's motions to dismiss each of the cross-claim plaintiffs' claims for cost recovery against Rogers Cartage as cross-defendant under Section 107 because the cross-claim plaintiffs had been sued by, and entered into a consent decree with, the United States.

> Judge Murphy stated,
>
> Starting with what *is* clear in light of *Atlantic Research,* Crossclaim Plaintiffs' may not attempt to recover from Rogers Cartage any reimbursable expenses incurred pursuant to their settlement agreements with the United States-those claims have been dismissed. On the other hand, under *Atlantic Research,* Crossclaim Plaintiffs apparently may pursue their § 107(a) cost recovery action for any so-called "voluntary costs"- *if* the potentially voluntary nature of these costs is supported, of course, by sufficient evidence. To demonstrate such voluntary response costs, Crossclaim Plaintiffs will need to show, at a minimum, that these costs were 1) incurred voluntarily *outside* the scope of any administrative order or consent decree, and 2) not reimbursable to another party. Such costs, incurred voluntarily, "are recoverable only by way of § 107(a)(4)(B)." <u>*Atlantic Research,* 551 U.S. 128 at 139 n. 6, 127 S.Ct. 2331.</u> This much is seemingly clear.

*Id.* at 789. While Judge Murphy's decision is not binding on this Court, the Court will not comment as this time as to whether it feels Judge Murphy's reasoning is persuasive and applicable. The Court has granted Phillips' motion for partial summary judgment as to Rogers Cartage's liability under CERCLA. *See* Fed. R. Civ. P. 56(a). Bifurcation of this litigation into liability and damages phases is warranted in light of the complicated and technical issues related to damages in CERCLA actions. *See Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667 (5th Cir. 1989). Thus, this case is far from over. In this Court's understanding, the standard for liability under CERCLA is the same, regardless of whether Phillips pursues a Section 107 claim, a Section 113 claim, or both. The Court feels the

issue of whether Phillips can pursue both a Section 107 and Section 113 is best left to the damages phase of this litigation, especially as Rogers Cartage has not yet commented on *Bernstein*. Accordingly, Rogers Cartage's motion for summary judgment is denied in its entirety at this time, as the Court defers to another day its determination as to whether Phillips can pursue both a Section 107 and a Section 113 CERCLA claim.

## V.   <u>CONCLUSION</u>

On the basis of the above, the Court finds as follows:

1.  Phillips' motion for partial summary judgment as to Rogers Cartage's liability is **GRANTED** (Doc. 77).

2.  Phillips' motion to strike affidavit of Charles Johnson, Sr., is **GRANTED in part**, as paragraphs 5 and 6 are stricken (Doc. 87).

3.  Rogers Cartage's motion for summary judgment as to Phillips' RCRA claim is **DENIED**. Rogers Cartage's motion for summary judgment as to Phillips' Section 107 claim is denied at this time, as the Court defers this issue until the damages phase (Doc. 74).

4.  Magistrate Judge Wilkerson has recently granted Rogers Cartage's motion to reopen discovery to allow Rogers Cartage to "investigate and learn the alleged damages sought by [Phillips]" (Doc. 101). This additional discovery is to be concluded by September 30, 2013 (Doc. 102). Magistrate Judge Wilkerson has set this matter for a settlement conference to be held on **Friday, October 11, 2013, at 9:00 a.m.** The Court strongly urges the parties to engage in these

settlement discussions in good faith and with the utmost determination to resolve this matter in a way that is most efficient and beneficial for all.

5.   Finally, should the parties not reach a settlement agreement, the Court sets the matter of damages for final pretrial conference to be held on **Thursday, October, 31, 2013, at 10:00 a.m.** At that time, the Court shall specially set a trial date and set a briefing schedule for the issues that remain, notably whether Phillips can recover under both Sections 107 and 113 of CERCLA. The Court refers the parties to the undersigned's Case Management Procedures for additional final pretrial conference procedures.

**IT IS SO ORDERED.**

Signed this 12th day of August, 2013.

David R. Herndon
2013.08.12
18:39:23 -05'00'

**Chief Judge**
**United States District Court**